UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HINO MOTORS, LTD.<br><br>Defendant. | Case: 2:25−cr−20016<br>Assigned To : Goldsmith, Mark A.<br>Referral Judge: Grand, David R.<br>Assign. Date : 1/15/2025<br><br>VIOLATION: 18 U.S.C. § 371 |

## INFORMATION

The United States Attorney's Office for the Eastern District of Michigan and the United States Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section, charge:

### COUNT ONE
**(18 U.S.C. § 371 – Conspiracy to Defraud the United States,
to Violate the Clean Air Act, to Commit Wire Fraud,
and to Smuggle Goods into the United States)**

### INTRODUCTORY STATEMENT

At times relevant to this Information:

1.     Hino Motors, Ltd. ("HML"), was a Japanese corporation, headquartered in Hino, Tokyo, Japan, engaged in the manufacturing of commercial vehicles and diesel engines. HML was a "Toyota Group Company" and subsidiary of the Toyota Motor Corporation, which was its controlling shareholder and parent company.

2.     Hino Motors Manufacturing U.S.A., Inc. ("HMM"), a Delaware corporation headquartered in Novi, Michigan, was a wholly owned subsidiary of HML, and a "Toyota Group Company." HMM, among other things, assembled diesel trucks with engines manufactured and imported to the United States by HML, and then sold the trucks through, among others, Hino Motor Sales U.S.A., Inc. ("HMS"). HMM also provided service and support to U.S. customers and HMS, including, among other things, engineering support for engine malfunctions and onboard diagnostic monitor issues.

3.     HML, by and through its employees, and others, conspired to, among other things, defraud the United States, violate the Clean Air Act by submitting fraudulent documents, to commit wire fraud, and unlawfully import and sell over 105,000 non-conforming heavy-duty diesel engines into the United States, for a total pecuniary gain of approximately $1,087,000,000.

## STATUTORY AND REGULATORY BACKGROUND

4.     The Clean Air Act and its implementing regulations (collectively, "the Clean Air Act") were designed to protect human health and the environment by, among other things, reducing emissions of pollutants including nitrogen oxides ("NOx") from new motor vehicles.

5.     The Clean Air Act required the U.S. Environmental Protection Agency ("EPA") to promulgate emissions standards for new motor vehicles and engines.

EPA established standards and test procedures for heavy duty diesel engines, including emission standards for NOx.

6.      The Clean Air Act prohibited manufacturers of new motor vehicle engines from selling, offering for sale, introducing or delivering for introduction into commerce, or importing (or causing the foregoing with respect to) any new motor vehicle engine unless the engine complied with emissions standards, including NOx emissions standards, and EPA issued a certificate of conformity ("CoC") for that specific model year ("MY") engine as required by the Clean Air Act and federal regulations implementing the Clean Air Act.

7.      To obtain a CoC, applicable regulations required manufacturers, such as HML, to submit an application to EPA for each MY and for each test group of a vehicle engine that it intended to sell in the United States. Applicable regulations further required the application to be in writing, to be signed by an authorized representative of the manufacturer, to include the results of testing done pursuant to the published Federal Test Procedures that measure NOx emissions, and to contain descriptions of the engine, emissions control system, and fuel system components, including a detailed description of each Auxiliary Emission Control Device ("AECD") installed in the engine.

8.      In addition, in the case of heavy-duty diesel engines, applicable regulations required manufacturers to test engine emissions themselves pursuant to

established protocols and report the emissions test data in their applications, certifying that the emissions were below the standard. Deviations from any protocols required approval from EPA.

9.     Manufacturers also were required to show that a heavy-duty diesel engine met emissions standards throughout its "full useful life" in their CoC applications. To do this, the regulations mandated manufacturers to conduct durability testing in which they simulated engine aging by running the heavy-duty diesel engine on a dynamometer for hundreds of hours and then to extrapolate the emissions results to predict emissions at the engine's end of useful life.

10.     Applicable regulations authorized the use of carryover data if no significant changes had been made to the engine since the prior year's application. However, to rely on such, manufacturers were required to affirm that all submissions, including carryover data, were truthful and accurate upon submission to EPA.

11.     In 2010, EPA updated its engine-testing procedure regulations and required, among other things, testing to be conducted in accordance with the detailed requirements set forth in 40 C.F.R. Part 1065.

12.     Regulations define an AECD as "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or

deactivating the operation of any part of the emission control system." In addition to listing all AECDs, manufacturers were required to include a justification for each AECD. If EPA, in reviewing the application for a CoC, determined that the AECD "reduced the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," and that (1) those conditions were not substantially included in the Federal Test Procedure, (2) the need for the AECD was not justified for protection of the vehicle against damage or accident, (3) the AECD went beyond the requirements of engine starting, or (4) the AECD applied to engines other than those that will be installed in emergency vehicles, then EPA would consider the AECD a "defeat device."

13.     Applicable regulations mandated that engine manufacturers such as HML report truthful and complete information and provided for potential criminal consequences for failing to meet this obligation. 40 C.F.R. § 1065.2. Beginning in 2016, EPA transitioned to an electronic filing system which required the following certifications/attestations: (1) "I unconditionally certify that this test group/engine family/vehicle family/evaporative family complies with the requirements of its corresponding parts, other referenced parts of the CFR and the Clean Air Act"; and (2) "I certify, under penalty of law that the information provided in this document is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the

possibilities of fines and imprisonment for knowing violations."

14.     Regulations made clear that engines were not covered by a CoC unless they were configured in the manner described in the application.

15.     In the absence of a valid CoC, a manufacturer could not import an engine into the United States or sell motor vehicle engines in the United States.

16.     EPA also required vehicle engines to comply with federal emissions standards throughout their useful lives and established procedures for testing the emission-control systems of vehicles in "actual use." 42 U.S.C. 7541(b). Regulations required manufacturers to perform such testing and report the results to EPA. *See* 42 U.S.C. 7542(a). If EPA determined that a substantial number of in-use vehicles of a particular model exceeded federal emissions standards, EPA could order a mandatory recall. 42 U.S.C. 7541(c)(1).

17.     EPA regulations separately established a process for a voluntary recall "initiated and conducted by a manufacturer to remedy any emission-related defect." 40 C.F.R. 85.1902(d).

18.     In addition, once a manufacturer imported an engine into the United States, a manufacturer could make a field fix to that engine to address emissions-related issue.  A field fix includes "any modification, removal, [replacement, or addition] of an emission-control related component by a manufacturer or dealer, or [any] revision by a manufacturer for implementation by dealers to specifications or

maintenance practices for emission-control related components on vehicles that have left the assembly line." Office of Air & Waste Management, EPA, Mobile Source Air Pollution Control Advisory Circular No. 2B, *Field Fixes Related to Emission Control-Related Components 2* (Mar. 17, 1975) (Circular).

19. U.S. Customs and Border Protection ("CBP") manages and secures our nation's borders, in part by enforcing trade laws, facilitating compliant trade, collecting revenue, and protecting the United States' economy from harmful imports and unfair trade practices. The CBP mission includes the enforcement of the customs, immigration, and agriculture laws of the United States and hundreds of other laws at the border on behalf of numerous federal agencies. Truthful information from importers is essential to fulfillment of CBP's mission. Importers must provide documentation and information necessary to enable CBP to determine whether merchandise may be released into United States commerce. 19 U.S.C. § 1484(a)(1)(A). An importer must use "reasonable care" to ensure the accuracy of entry documents, 19 U.S.C. § 1484(a)(1), and declare under oath, among other things, that all statements in the entry and documents filed with the entry are true and correct. 19 U.S.C. § 1485(a)(3).

20. CBP's ability to rely on accurate and truthful entry information provided by importers is essential to fulfilling its mission of facilitating lawful trade and enforcing the Clean Air Act at the border. Under the Clean Air Act, new motor

vehicle engines offered for importation or imported in violation of mandated CoC requirements are prohibited from entry. 42 U.S.C. § 7522(b)(2). CBP has also promulgated regulations regarding compliance with federal emissions requirements, which are "ancillary to the regulations of the [EPA] issued under the Clean Air Act...." 19 C.F.R. § 12.73(a). Per CBP regulation, a heavy-duty engine with an issued CoC may be deemed to comply with applicable emissions requirements, but the engines must "*in their condition as imported* [be] covered by an EPA certificate of conformity and . . . bear the manufacturer's label showing such conformity and other EPA-required information." 19 C.F.R. § 12.73(b)(1) (emphasis added). As with the dictate of the Clean Air Act, CBP regulations provide that the importation of heavy-duty engines otherwise than in accordance with CBP and EPA regulations is prohibited. 19 C.F.R. § 12.73(m). As such, while CBP may accept the issuance of a CoC as evidence of EPA compliance, non-compliant engines that violate EPA regulations are still prohibited from entry.

21.   The California Air Resources Board ("CARB") (together with EPA, "U.S. regulators") issued its own certificates, called executive orders, for the sale of motor vehicles in the State of California. To obtain such a certificate, the manufacturer was required to satisfy the standards set forth by the State of California, which were equal to or more stringent than those of EPA. Manufacturers could not sell motor vehicle engines in California without first obtaining an annual

executive order from CARB.

22.     As part of the application for a certification process, manufacturers often worked in parallel with EPA and CARB. To obtain a CoC from EPA, manufacturers were also required to demonstrate that the heavy-duty diesel engines were equipped with an on-board diagnostic ("OBD") system capable of monitoring emissions-related systems or components. Manufacturers could demonstrate compliance with California OBD standards to meet federal requirements. CARB reviewed applications from manufacturers to determine whether their OBD systems complied with California OBD standards, and CARB's conclusion would be included in the application the manufacturer submitted to EPA.

23.     EPA retained the authority to void a CoC under specific circumstances, including where the manufacturer knowingly submitted false or inaccurate information, or knowingly rendered test data inaccurate or invalid, in applications for certification. 40 C.F.R. § 1065.2(c).

24.     After receipt of a CoC, manufacturers such as HML had a continuing obligation to report emission-related defects whenever the manufacturer determined that an emission-related defect may affect a certain percentage of their vehicles. The emission-related defect information report ("EDIR") served two key functions. First, it encouraged manufacturers to identify emission-related defects early and to promptly conduct voluntary recalls to remedy those defects that warranted action.

Second, EDIRs provided EPA with an early warning that a vehicle or engine class is at risk of failing to perform as described in the CoC and required by emission standards.

25.     The Department of Transportation ("DOT") had the authority to promulgate fuel economy standards for commercial heavy-duty on-road vehicles and work trucks through 49 U.S.C. § 32902(b)(1)(C) and (k). DOT established test methods, measurement metrics, fuel consumption standards, and compliance and enforcement protocols for heavy-duty vehicles, implemented by the National Highway Traffic Safety Administration ("NHTSA").

26.     NHTSA's implementing regulations were designed to conserve fuel by, among other things, establishing maximum levels for fuel consumption and increasing fuel efficiency of on-road vehicles with heavy-duty diesel engines.

27.     As part of the process of obtaining a CoC previously described, applicable NHTSA regulations required that manufacturers, such as HML, provide fuel consumption values for each MY to NHTSA "through the EPA database." 49 C.F.R. § 535.8(a)(2); *see also* 49 C.F.R. § 535.8(c) (requiring applications of CoCs to be submitted through this database, "including both GHG emissions and fuel consumption information for each given model year"). This electronic database was designed to be the "single point of entry for all information required," with "both agencies [having] access to the information." 49 C.F.R. § 535.8(a)(2).

28.    NHTSA regulations further made clear that NHTSA would receive information from EPA as specified in 40 C.F.R. §§ 1036.755 and 1037.755, 49 C.F.R. § 535.8(i), and incorporated the requirement that emissions testing be performed in Part 1065-compliant cells.[1]

29.    NHTSA regulations specified different fuel consumption standards based on the type of vehicle or engine and MY. With regards to heavy-duty engines, fuel consumption standards were expressed in gallons per 100 horsepower-hour. 49 C.F.R. § 535.5(d). Each category of heavy-duty engine was required to have a fuel consumption value below the number enumerated in 49 C.F.R. § 535.5(d). In determining the applicable standards and compliance, manufacturers were advised to "use the same options they use to comply with EPA in [40 C.F.R. § 1036.108] in terms of grouping engines . . .." *Id*. Mandatory compliance with fuel consumption standards began with MY 2017 for heavy-duty diesel vehicles and engines. As relevant here, HML was required to submit values for Steady-State Fuel Consumption and Combined Transient Fuel Consumption.

---

[1] 40 C.F.R. § 1065 governs "all aspects of engine testing, including the equipment specifications, calibrations, calculations, and other protocols and procedural specifications needed to measure emissions." 40 C.F.R. § 1065.1(e).  In so doing, Part 1065 sets an industry-wide standard for uniform, accurate, and precise data collection with regard to the measurement of exhaust emissions from vehicles and engines and requires the use of test cells that are compliant with such standards.

## FACTUAL BACKGROUND

30.     HML designed, manufactured, and tested engines for the Japanese and global market, including both non-road and on-road heavy-duty diesel engines. HML established a business group, Powertrain Evaluation and Engineering ("PTE"), which was responsible for running emissions tests and generating test data for CoC applications. Prior to April 2017 and after June 2020 through November 2022, PTE's management hierarchy, including senior management oversight, was from top to bottom as follows: Senior Managing Officer, Managing Officer/Senior General Manager, General Manager, Assistant General Manager, Deputy General Manager, Group Manager, and Person in Charge. From April 2017 through June 2020, an Executive Vice President position was at the top of the hierarchy.

31.     Between 2009-2019, PTE's U.S. on-road engine work was divided into multiple groups, including a group responsible for emissions testing and another group responsible for OBD calibration and testing.

32.     PTE was responsible for both calibrating engines and for conducting certification tests to determine if those same engines met regulatory requirements.

33.     PTE did not provide the information, including testing results, directly to U.S. regulators. Instead, HML established another business group, Vehicle Regulatory Compliance Department ("VRC"), which was responsible for compiling CoC applications and submitting them electronically to U.S. regulators.

34.     HML also established the Customer Quality Engineering Division ("CQE"), which was responsible for recalls and defect reporting. CQE determined when and what was reported to U.S. regulators, through VRC or HMM, after an engine had been certified. HML executives also participated in meetings about whether to conduct recalls and to issue stop sales.

35.     HMM established a separate business group, the Vehicle Regulatory Compliance – Liaison group ("VRC-L"), at HMM's Novi, Michigan location, to act as a liaison with regulators and to help explain U.S. regulations to HML personnel.

36.     No later than 2009, faced with limited resources and pressure to secure CoCs on schedule for engines destined to the U.S. market, engineers within PTE at HML employed a variety of illicit short-cuts, including falsifying/altering data, skipping required testing, concealing the fact that certain OBD monitors were non-functioning, and concealing and omitting material facts in applications and communications to U.S. federal and state regulators. This intensified, among other things, the practice PTE engineers referred to internally as "licking the pencil," a practice that multiple PTE engineers stated was in place since the 1990s. In essence, some HML employees made up or altered test results and submitted, and caused to be submitted, the fabricated data in the applications for CoCs. In addition, beginning no later than 2012 and continuing through 2019, and with the knowledge of their supervisors, PTE engineers routinely wrapped insulation around the after-treatment

system to increase the temperature, which reduced NOx emissions during certification testing, including baseline emissions testing and OBD demonstration emissions testing. PTE engineers did so despite the knowledge that insulation was not present on their production vehicles. HML did not disclose its use of insulation to reduce NOx emissions to EPA or CARB.

37.     In October 2010, Hino's outside consultants on North American engine certification and OBD expressed serious concerns about Hino's U.S. certification process. The consultants noted: insufficient review of final certification documents, repeated deficiencies, incomplete reporting, submitted content being changed without adequate explanation, consultant input being neglected and employees acting arbitrarily, possible forgery of OBD test data, lack of understanding of OBD regulations, lack of appreciation for the importance of complying with OBD regulations, and insufficient planning/preparation for the certification process. The consultants' concerns were forwarded to several PTE employees, Co-Conspirator 1 (who was the Group Manager of PTE, and later promoted to Deputy General Manager in 2011 and then to Assistant General Manager in 2014, as well as the VRC employee responsible for submitting certification applications to EPA.

38.     In October 2015, one of the same outside OBD consultants for Hino expressed serious concerns about Hino's OBD development process, noting that the company's MY2016 "information is inaccurate and incomplete" and that the OBD

development process needed to change. The consultant again shared his concerns with, among other employees, multiple VRC employees, including a Senior Vice President within VRC-L, and two PTE engineers, including Co-Conspirator 1. Hino did not heed the warnings of its consultants, nor did it take corrective actions such as conducting an audit or creating a compliance program, and PTE engineers continued employing the illicit short-cuts noted above.

39.     In late 2016, Hino hired Witness A as a Senior Vice President at HMM to support the certification process, understand regulatory trends, and report to HML's certification team. Between 2017 and 2019, Witness A repeatedly warned HML and HMM executives about failures to report emission defects, certification issues, and problems with OBD development, including paper monitors (a term that HML engineers used to refer to a monitor that appeared to work on paper but did not function on the road) that could lead to a stop sale order from regulators with respect to the J05E and J08E engines or delays in the certification of future A09C engines. Witness A also recommended organizational and process changes. Despite the warnings, Hino continued to submit applications for CoCs for non-road and on-road heavy-duty diesel engines.

40.     In October 2017, Hino employees met with CARB and EPA about two monitors that did not work, the DEF Quality Monitors #1 and #2, both of which Hino falsely claimed were only impacted for MY2015 through MY2017. Hino disclosed

that one monitor did not satisfy the SCR [selective catalytic reduction] guidelines and impacted its J08E and J05E engines. Hino further disclosed that the second monitor did not comply with OBD regulations and impacted its J05E engine. U.S. regulators concluded it was an emissions defect that required a stop sale. Hino filed an EDIR on November 3, 2017. This is the last EDIR Hino filed between November 3, 2017, and June 30, 2021.

41.     On October 27, 2017, HMM's President emailed HML senior management (including an Executive Vice President, Senior Managing Officer, and general managers) an attachment describing internal concerns about multiple regulatory and U.S. certification issues, including non-compliant OBD monitors, incorrect Infrequent Regeneration Adjustment Factor ("IRAF") numbers, and a possible defeat device. Regarding OBD, the attachment warned that the high-flow EGR [exhaust gas recirculation] monitor was a "paper monitor" that did not appear to be running in the real world, which could lead to a suspension of sales. The attachment warned that if CARB found an invalid monitor of this type, it could be considered fraud. The attachment also warned that the OBD monitors associated with diagnostic trouble codes P229F, P2201, and P04DA did not work in the real world. Regarding Hino's reported IRAF, the attachment noted that Hino had made mistakes for the last three years, which were a "red flag" to EPA, and that a confirmatory test had been threatened. The attachment also highlighted that the DEF

16

reduction at elevation AECD could be considered a defeat device.

42.   By June 2018, several Hino engineers knew that Hino's engines contained other OBD monitors that did not function and otherwise did not comply with regulations. Those monitors were designed to ensure compliance with emission standards and included, at a minimum:

| Monitor | Emissions-Related Nature |
|---|---|
| P2BAE<br>(SCR Feedback Monitor) | $NO_x$ |
| P24A0 and P24A1<br>(DPF[2] Feedback Monitor) | PM |
| P2201<br>(Upstream $NO_x$ Sensor Offset Monitor) | $NO_x$ |
| P229F<br>(Downstream NOx Sensor offset Monitor) | $NO_x$ |
| P04DA<br>(High Flow EGR Monitor) | $NO_x$ |

43.   On or about June 25, 2018, the conspirators, including HML executives, made the decision to withhold from regulators problems with the DPF Feedback Monitor "because there [was] too much risk in reporting it to the authorities as is." At the time of this decision, the conspirators knew that the non-compliance dated back to MY2010.

44.   On September 28, 2018, Hino's outside consultant recommended that the company file emission-related defect reports for non-functioning OBD monitors

---

[2] Diesel Particulate Filter.

as required by U.S. regulations, writing:

> In some of our earlier meetings / conversations, there was some talk of meeting with EPA. If it has not been done already, I recommend Hino prepare and submit Emission Defect Information Report(s) (EDIRs) to EPA as soon as practical. If EDIRs have already been submitted, consider submitting updated information to EPA so that the information available to both CARB and EPA are in synch. [sic] I expect you are aware that EPA's emission defect reporting regulations expect manufacturers to submit EDIRs once it has been determined that defects exsit [sic], even if remedial action(s) are not defined or planned. Any products which are not eligible for OBD deficiency or are anticipated to be included in a recall should be covered by the EDIR, i.e. MY15 through most of MY18 (prior to Running Change implementation).

45. In or around June 2018, EPA's Office of Transportation and Air Quality ("OTAQ") selected a Hino on-road diesel engine for compliance testing. It failed. Hino engaged a third party to re-run the testing, and the engine passed.

46. No later than November 2018, senior leadership at HML knew that PTE engineers had failed to use Part 1065-compliant test cells in connection with all emissions testing for U.S. CoCs as required by U.S. federal regulations. In fact, HML ran most of its U.S. on-road engine certification tests in non-Part 1065 compliant cells (including emissions, durability, and OBD demo testing).

47. On July 19, 2019, Hino advised regulators via letter that certain emissions tests were not performed in Part 1065-compliant test cells as required by the regulations, after previously disclosing potential Part 1065 non-compliance issues in a meeting with EPA and CARB on June 6, 2019.

48.    On March 4, 2022, HML publicly acknowledged misconduct in connection with emissions and fuel economy representations in its certification applications relating to vehicle engines for the Japanese market.

### HINO HEAVY-DUTY DIESEL ENGINES
### SOLD IN THE UNITED STATES

49.    Hino sold, offered for sale, introduced into commerce, delivered for introduction into commerce, imported into the United States, or caused the foregoing actions (collectively, "sold in the United States") the following non-road and on-road heavy-duty diesel engines, designed and tested by PTE ("Subject Engines"):

  a.  J08E-VB, MY 2010 through 2019

  b.  J08E-VC, MY 2010 through 2015

  c.  J08E-WU, MY 2016 through 2019

  d.  J05E, MY 2012 through 2019

  e.  A09C, MY 2019

  f.  J08E-TM in MY 2010

  g.  J08E-UM in MY 2010 and 2011

  h.  J08E-UV in MY 2011 through 2013

  i.  J08E-VV in MY 2014 through 2019

  j.  J08E-YD in MY 2019

  k.  J08E-WV in MY 2017 through 2019

  l.  E13C-YM in MY 2019

    m.     E13C-VV in MY 2011 through 2013

    n.     E13C-UV in MY 2010

    o.     J05E-TA in MY 2010 and 2011

    p.     J05E-TB in MY 2010

    q.     J05E-TJ in MY 2012 through 2014

    r.     J05E-TK in MY 2011 through 2013

    s.     J05E-UM in MY 2014 through 2019

    t.     J05E-UN in MY 2014 through 2019

    u.     J05E-VA in MY 2019

    v.     J05E-YD in MY 2019

    w.     J05E-VB in MY 2019

    x.     P11C-UN in MY 2010

    y.     P11C-UP in MY 2010

    z.     P11C-VC in MY 2011 through 2013

    aa.     P11C-VN in MY 2015 through 2019

    bb.     E13C-YM in MY 2019

50.    VRC prepared and submitted the applications (the "Applications") for CoCs and executive orders (collectively, "Certificates") for Subject Engines to U.S. regulators to obtain authorization to import the engines into the United States, and to sell the engines installed in Hino trucks. PTE performed all testing related to the

Subject Engines.

51.    The Applications to EPA were accompanied by a signed statement by a VRC representative and/or PTE representative, attesting that: (1) the engines had been tested in compliance with applicable test procedures, using, among other things, the equipment required under 40 C.F.R. Parts 86 and 1065 and/or applicable California test standards; (2) based on those tests, the engines conformed to the requirements of 40 C.F.R. Parts 86 and 1065; and (3) the engines were as described in the Applications and complied with all requirements of 40 C.F.R. Parts 86, 89, 1065, 1036, 1039, 1068 and/or applicable California regulations as well as the Clean Air Act. After 2016, the VRC employee further attested that, under penalty of law, the information provided in the application package was, to the best of his/her belief and knowledge, true, accurate and complete. The VRC employee further acknowledged the potential penalties for submitting false information.

52.    Based on the false representations made by HML employees in the Applications for the Subject Engines, EPA and CARB issued Certificates for these engines, allowing the Subject Engines to be imported and sold in the United States.

53.    Hino represented and caused representations to be made to its U.S customers, U.S. dealers, U.S. regulators, and others that the Subject Vehicles met the U.S. emission standards identified in Paragraph 48 above.

## OFFENSE CONDUCT

54.     From at least 2009 and continuing through at least November 2022, the exact dates unknown, in Oakland County, within the Eastern District of Michigan, and elsewhere, defendant Hino Motors, Ltd., by and through its employees acting within the scope of their employment and at least in part, for the benefit of Hino Motors, Ltd., along with others, both known and unknown to the United States, did willfully, knowingly, and deliberately combine, conspire, and confederate and did agree to:

  a.  defraud the United States by impairing, impeding, obstructing, and defeating a lawful function of the federal government, that is, EPA's function of implementing and enforcing emissions standards for air pollutants for new motor vehicles under the Clean Air Act, by deceitful and dishonest means, in violation of 18 U.S.C. § 371;

  b.  defraud the United States by impairing, impeding, obstructing, and defeating a lawful function of the federal government, which it conducted through NHTSA, as to the enforcement of fuel consumption standards for heavy-duty diesel engines, by deceitful and dishonest means, in violation of 18 U.S.C. § 371;

  c.  violate the Clean Air Act, by making, and causing to be made, false material statements, representations, and certifications in, and omitting

22

and causing to be omitted material information from, notices, applications, records, reports, plans, and other documents required pursuant to the Clean Air Act to be filed and maintained, in violation of 42 U.S.C. § 7413(c)(2)(A);

d.  commit wire fraud, that is, knowingly, willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmit and cause to be transmitted by means of wire, radio, and television communication, writings, signs, signals, pictures, and sounds in interstate and foreign commerce for the purpose of executing such scheme and artifice in violation of 18 U.S.C. § 1343; and

e.  smuggle goods into the United States, that is, fraudulently and knowingly, importing and bringing into the United States, any merchandise contrary to law and receiving, concealing, selling, and in any manner facilitating the transportation, concealment, and sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law, in violation of 18 U.S.C. § 545.

## Purpose of the Conspiracy

55.    The purpose of the conspiracy was for HML, by and through its employees, acting within the scope of their employment as agents and employees of HML, and at least in part, for the benefit of HML, along with others both known and unknown to the United States, to unlawfully enrich the company and themselves, by, among other things, (a) deceiving U.S. regulators in order to obtain the necessary certificates of conformity and executive orders to import and to sell the Subject Engines in the United States; (b) installing the Subject Engines into trucks sold in the United States knowing that the engines did not meet U.S. emissions standards; (c) deceiving U.S regulators and U.S. customers by making false and misleading representations about the Subject Engines; and (d) concealing these facts from U.S. regulators and U.S. customers.

## Manner and Means of the Conspiracy

56.    From no later than 2009 until at least November 2022, the exact dates unknown, HML, by and through its employees, acting within the scope of their employment as agents and employees of HML, and at least in part, for the benefit of HML, along with others both known and unknown to the United States, agreed to deceive U.S. regulators, U.S. customs officials, and U.S. customers about the emissions of pollutants from the Subject Engines and OBD functionality in the Subject Engines in the following ways:

24

a. *Altered and falsified emissions test data*: From at least 2010 through 2019, the conspirators regularly falsified/altered low-hour Federal Test Procedure (FTP) certification test data submitted to U.S. regulators and failed to conduct testing in cells compliant with the regulatory requirements of 40 C.F.R. § 1065;

b. *Failed to perform durability tests*: From at least 2010 through 2019, the conspirators failed to perform proper long-term durability tests for any U.S. engine by failing to use Part 1065-compliant test cells, misreporting dates of tests, misreporting hours on engines, and/or changing the data, and by wrapping insulation around the after-treatment system to reduce NOx emissions and failing to disclose the modification in the accompanying application;

c. *Falsified information relevant to OBD monitors (on-road engines only)*: Beginning no later than the 2009 application for MY 2010, the conspirators listed certain OBD monitors as being operational, knowing that they were "paper monitors," that is, not functioning and knowing that OBD demonstration tests were not done in compliance with regulations and data was altered/fabricated by what was termed internally as "licking the pencil;"

d. *Failed to disclose Auxiliary Emissions Control Devices*: From at least

25

MY2010 through at least MY2019, the conspirators failed to disclose AECDs, which altered the functioning of an engine's emissions control system, as required by regulation; and

e. *Use of Carry-Over Data:* The conspirators repeatedly relied on falsified carryover data in Applications, knowing such data was invalid, to secure Certificates.

57.    The conspirators then caused these false and misleading Applications for Certificates, as well as amended Applications, to be submitted to U.S. regulators by VRC, knowing that EPA, CBP, and NHSTA would rely on the information in approving the Certificates, allowing the engines to be imported into the United States, and in calculating fuel economy.

58.    After receiving the false, fraudulent, and misleading representations, U.S. regulators issued Certificates to which HML's engines were not entitled.

59.    Between 2016 and 2018, the conspirators failed to conduct applicable emissions testing in Part 1065-compliant cells.

60.    For MY2017 and MY2018, the conspirators submitted, or used, false and fraudulent carbon dioxide ($CO_2$) emissions test data which, in turn, resulted in false values being submitted for the Steady-State Fuel Consumption and Combined Transient Fuel Consumption of HML's heavy-duty diesel engines.

61.    For MY2017 and MY2018, the conspirators falsely certified that the

information in the applications, including the data used to show that their engines complied with applicable fuel consumption standards, was true. Hino submitted the applications through the use of interstate wires.

62.     Hino then utilized these improperly obtained Certificates to illicitly import non-conforming engines into the United States and subsequently sell those same engines in interstate commerce and through the use of interstate wires.

## Overt Acts

63.     In furtherance of the conspiracy and to achieve its objects and purpose, at least one of the conspirators committed and caused to be committed, in the Eastern District of Michigan, and elsewhere, at least one of the following overt acts, among others:

a.  On or about September 4, 2009, and on other occasions thereafter, up to and including February 4, 2021, the conspirators submitted and caused to be submitted by wire altered and fabricated emissions data in connection with their Applications for Certificates and amended Applications.

b.  On or about September 4, 2009, and on other occasions thereafter, up to and including February 4, 2021, the conspirators submitted and caused to be submitted by wire Applications for Certificates and amended Applications to be certified as being in compliance with U.S.

regulations, knowing that the engines contained non-functioning OBD monitors.

c.   On or about September 4, 2009, and on other occasions thereafter, up to and including February 4, 2021, the conspirators submitted and caused to be submitted by wire Applications for Certificates and amended Applications to be certified as being in compliance with U.S. regulations, knowing that they failed to perform emissions tests in Part 1065-compliant cells.

d.   On or about September 4, 2009, and in subsequent Applications, the conspirators failed to disclose at least two AECDs: (1) hydrocarbon poisoning control; and (2) DEF dosing at idle.

e.   On or about February 9, 2011, the conspirators received a question from CARB about a discrepancy in the reported NOx emissions between the certification test and durability test results submitted to CARB. On April 12, 2011, the conspirators prepared a response for CARB, falsely claiming that the discrepancy was due to variation in engine coolant temperature. That false response was sent to CARB on or about April 13, 2011.

f.   In May 2012, two co-conspirators in PTE's OBD group exchanged emails about problems with baseline emissions and OBD

demonstration certification tests for the MY2013 J05E engine. One conspirator wrote on May 7, 2012, that the engine was "nowhere near the US10 application value," and that "significant efforts would have to be made in order to reduce the NOx." The same conspirator suggested that, if the physical setup could not be changed, "then for the time being, I think you can get away with changing the post temperature increase start temperature map (MTHATCBDLN_D)[.]" On May 31, 2012, the other conspirator followed up stating that they had replaced the engine catalyst and ATC pipe but "we could not resolve the emission issue." The conspirator concluded, "I think we have no choice but to lick the pencil for the application data." Hino submitted "pencil licked" or manipulated emissions results in its U.S. certification applications for the MY2013 J05E engine.

g.  On or about August 22, 2014, the co-conspirators in the OBD testing group emailed each other regarding instructions from their supervisor, then-PTE Group Manager/Co-Conspirator 2, to skip NTE testing because "we don't have time." One of the co-conspirators then wrote, "If that's so, then aren't the FTP and RMC [tests] unnecessary too? If we are 'licking' all of them anyway, isn't it unnecessary?"

h.  On November 4, 2015, Co-Conspirator 2 emailed other engineers,

including Co-Conspirator 1, asking if they had emissions data regarding a specific OBD monitor for the J08E engine. Co-Conspirator 2 wrote, "I have heard that there are none, so engine-out or estimated values are acceptable. I'm going to lick a pencil…" Co-Conspirator 2 was sent a PowerPoint which stated that the engine did not meet a specific CARB monitor exemption because NOx emissions limits were exceeded. On November 6, 2015, Co-Conspirator 2 responded, "Thank you very much. For the insufficient data, I am going to lick a pencil, though…"

i.  On or about September 9, 2016, a conspirator caused fabricated emissions data for the MY2017 J05E engine to be submitted to EPA. The conspirators caused the false data to be carried over to the MY2018 J05E engine application for a CoC.

j.  On or about November 1, 2016, in response to CARB's request for an AECD Defeat Device Statement of Compliance for applicable engines, Co-Conspirator 1 signed statements on behalf of HML, affirming that all AECDs had been declared and described in the application, knowing such statement to be false.

k.  On or about November 2, 2016, Co-Conspirator 1 caused the false AECD Defeat Device Statement of Compliance to be submitted to CARB.

30

l.  On or about October 9, 2017, Co-Conspirator 2 instructed testing engineers to modify calibrations during testing to make test results appear to meet or exceed applicable standards. When test results still exceeded NOx standards, Co- Conspirator 2 instructed the testing engineers "we have no choice but to move forward. (At the end, licking the pencil and correction factor…?)".

m.  From on or about July 2015 to September 2017, Co-Conspirator 2 modified the results of OBD emissions testing to make results appear to meet emissions standards when in fact the results exceeded those standards. In multiple cases, testing results were modified from failing "measured" results to "pencil licked" or "licked" results which appeared to pass U.S. emissions standards. On or about October 23, 2015, September 13, 2017, and other occasions, the fabricated results were provided to CARB and/or EPA.

n.  In September 2018, to conceal their non-compliant engines and non-functioning OBD monitors from regulators, the conspirators decided not to file required emission-related defect reports.

o.  In November 2018, in response to a request from CARB for all maintenance records for test cells used to conduct testing for the MY2019 A09C engine, the conspirators (including the Senior General

Manager that oversaw PTE) intentionally failed to produce a complete set of such logs and calibration data. The conspirators did so to conceal the use of non-Part 1065-compliant cells used for testing, in violation of applicable regulations, and one conspirator advised others, "[i]t was the councilor's decision that, for CARB, it would be troublesome for any bench names other than S33 to be mentioned." At the time, S33 was HML's only Part 1065-compliant bench.

p. On November 27, 2018, the conspirators falsely claimed to CARB in connection with a voluntary recall that HML's "SCR feedback monitor may not robustly detect real world failures," when, in fact, the conspirators knew that the monitor was designed not to trigger the malfunction indicator light, that is, it would always register a passing result and never detect failure. In that same communication, the conspirators falsely claimed that the SCR feedback monitor issue impacted J08E MY2015 to MY2018 engines, when in fact the conspirators knew that the non-functioning monitor dated back to MY2010.

q. Between October 2017 and June 2019, Hino, by and through Witness A, met with CARB and/or EPA on at least twelve occasions. At each meeting, Hino failed to disclose to regulators that its engineers: (1)

32

altered and falsified emissions data; (2) failed to conduct testing in accordance with 40 C.F.R. Part 1065; (3) falsified information relevant to OBD monitors; and (4) failed to disclose AECDs.

r.  Between November 3, 2017, and June 30, 2021, the conspirators failed to file an emission-related defect report for the monitors that did not function and otherwise comply with regulations designed to ensure compliance with emissions standards.

s.  For each of the on-road engines listed and, on the dates set forth below, the conspirators caused EPA to issue a CoC knowing that the application contained materially false representations and/or material omissions, in addition to the fact the engines were tested in test cells that failed to comply with Part 1065:

| Engine Model Year Engine Family | CoC Issued (on or about) | Nature of the Materially False Representation and/or Material Omission |
|---|---|---|
| J08E-VB MY2010 AHMXH07.7JVB | July 23, 2010 | -Falsified data<br><br>-Undisclosed DEF limiting AECD |
| J08E-VC MY2010 AHMXH07.7JVC | June 23, 2010 | -Falsified data<br><br>-No supporting data as required by regulation<br><br>-Undisclosed DEF limiting AECD |

| Engine Model Year Engine Family | CoC Issued (on or about) | Nature of the Materially False Representation and/or Material Omission |
|---|---|---|
| J08E-VB MY2011 BHMXH07.7JVB | October 25, 2010 | -Carry-over of falsified/altered data<br><br>-Undisclosed DEF limiting AECD |
| J08E-VC MY2011 BHMXH07.7JVC | October 25, 2010 | -Carry-over of falsifed/altered data<br><br>-No supporting data as required by regulation<br><br>-Undisclosed DEF limiting AECD |
| J08E-VB MY2012 CHMXH07.7JVB | December 27, 2011 | -Carry-over of falsified/altered data<br><br>-No supporting data as required by regulation<br><br>-Undisclosed DEF limiting AECD |
| J08E-VC MY2012 CHMXH07.7JVC | December 27, 2011 | -Carry-over of falsified/altered data<br><br>-No supporting data as required by regulation<br><br>-Undisclosed DEF limiting AECD |
| J05E MY2012 CHMXH05.1JTP | March 3, 2011 | -Durability test data altered (altered data and test dates)<br><br>-Improper test methods<br><br>-No supporting data as required by regulation<br><br>-Undisclosed DEF limiting AECD |
| J08E-VB MY2013 DHMXH07.7JVB | November 28, 2012 | -Carry-over of falsified/altered data<br><br>-Undisclosed DEF limiting AECD |

| Engine Model Year Engine Family | CoC Issued (on or about) | Nature of the Materially False Representation and/or Material Omission |
|---|---|---|
| J08E-VC MY2013 DHMXH07.7JVC | December 5, 2012 | -Carry-over of falsified/altered data<br><br>-Undisclosed DEF limiting AECD |
| J05E MY2013 DHMXH05.1JTP | December 21, 2012 | -Carry-over of falsified/altered data<br><br>-Undisclosed DEF limiting AECD |
| J08E-VB MY 2014 EHMXH07.7JVB | November 13, 2013 | -Falsified data<br><br>-No supporting data as required by regulation<br><br>-Undisclosed DEF limiting AECD |
| J08E-VC MY 2014 EHMXH07.7JVC | November 13, 2013 | -Falsified data<br><br>-No supporting data as required by regulation<br><br>-Undisclosed DEF limiting AECD |
| J05E MY 2014 EHMXH05.1JTP | November 13, 2013 | -Carry-over of falsified/altered data<br><br>-Undisclosed DEF limiting AECD |
| J08E-VB MY 2015 FHMXH07.7JVB | November 26, 2014 | -Carry-over of falsified/altered data.<br><br>-Field Fix data falsified.<br><br>-Undisclosed DEF limiting AECD |
| J08E-VC MY 2015 FHMXH07.7JVC | November 26, 2014 | -Carry-over of falsified/altered data.<br><br>-Field Fix data falsified.<br><br>-Undisclosed DEF limiting AECD |

| Engine Model Year Engine Family | CoC Issued (on or about) | Nature of the Materially False Representation and/or Material Omission |
|---|---|---|
| J05E MY 2015 FHMXH05.1JTP | November 12, 2014 | -Durability test data altered (altered data and test dates) - No supporting data as required by regulation -Improper test method. -Undisclosed DEF limiting AECD |
| J08E-VB MY 2016 GHMXH07.7JVB | November 20, 2015 | -Carry-over of falsified/altered data -Undisclosed DEF limiting AECD |
| J08E-WU MY 2016 GHMXH07.7JWU | November 20, 2015 | -Falsified data -No supporting data as required by regulation -Undisclosed DEF limiting AECD |
| J05E MY 2016 GHMXH05.1JTP | November 20, 2015 | -Carry-over of falsified/altered data -Undisclosed DEF limiting AECD |
| J08E-VB MY 2017 HHMXH07.7JVB | November 17, 2016 | -No FTP data; durability testing altered -Undisclosed DEF limiting AECD |
| J08E-WU MY 2017 HHMXH07.7JWU | November 17, 2016 | -Falsified and altered data -No supporting data as required by regulation -Undisclosed DEF limiting AECD |

| Engine Model Year Engine Family | CoC Issued (on or about) | Nature of the Materially False Representation and/or Material Omission |
|---|---|---|
| J05E MY 2017 HHMXH05.1JTP | November 17, 2016 | -Altered data and test dates<br><br>-No supporting data as required by regulation<br><br>-Undisclosed DEF limiting AECD |
| J08E-VB MY 2018 JHMXH07.7JVB | November 29, 2017 | -Falsified data<br><br>-No supporting data as required by regulation<br><br>-Used insulation and did not disclose in application<br><br>-Undisclosed DEF limiting AECD |
| J05E MY 2018 JHMXH05.1JTP | November 29, 2017 | -Falsified data<br><br>-No supporting data as required by regulation<br><br>-Undisclosed DEF limiting AECD |
| J08E-VB MY 2019 KHMXH07.7JVB | March 6, 2019 | -Carry-over of falsified/altered data.<br><br>-No supporting data as required by regulation<br><br>-Undisclosed DEF limiting AECD |
| J05E MY 2019 KHMXH05.1JTP | March 5, 2019 | -Carry-over of falsified/altered data<br><br>-No supporting data as required by regulation<br><br>-Undisclosed DEF limiting AECD |

| Engine Model Year Engine Family | CoC Issued (on or about) | Nature of the Materially False Representation and/or Material Omission |
|---|---|---|
| A09C MY 2019 KHMXH08.9AVF | March 25, 2019 | -Durability testing data altered; failed to use 1065 compliant test cell<br><br>-Undisclosed DEF limiting AECD |

t. Beginning no later than 2010, and continuing up through and including 2021, the conspirators imported and caused to be imported in the United States at least the following number of on-road heavy-duty diesel truck engines without a valid CoC for those engines:

| Year of Import | Approx. Number of Engines Imported |
|---|---|
| 2010 | 233 |
| 2011 | 1551 |
| 2012 | 4444 |
| 2013 | 5737 |
| 2014 | 5563 |
| 2015 | 11869 |
| 2016 | 12010 |
| 2017 | 10451 |
| 2018 | 12336 |
| 2019 | 19261 |
| 2020 | 988 |
| 2021 | 2 |
| Unconfirmed Import Date | 20,595 |

u.  Beginning in 2010, and continuing up through and including November
2022, the conspirators sold and caused to be sold in the United States
at least the following number of on-road heavy-duty diesel trucks with
non-conforming engines:

| Year of Sale | Approx. Number of Engines Sold |
|---|---|
| 2010 | 1860 |
| 2011 | 4999 |
| 2012 | 7532 |
| 2013 | 7341 |
| 2014 | 9561 |
| 2015 | 11641 |
| 2016 | 11821 |
| 2017 | 13484 |
| 2018 | 14921 |
| 2019 | 14579 |
| 2020 | 6072 |
| 2021 | 316 |
| 2022 | 6 |
| TOTAL | 104,134 |

v.  On or around April 9, 2021, with knowledge of the fraud in connection
with the Applications, the conspirators made the decision to stop taking
new orders for trucks equipped with HML engines, but to continue
fulfilling existing orders knowing that the trucks contained non-
conforming engines.

w.  Between April 9, 2021, and May 21, 2021, the conspirators caused to
be sold in the United States, an additional 36 trucks, all with non-

conforming engines.

x.   By August 18, 2021, the conspirators caused to be sold in the United States an additional 32 trucks, all with non-conforming engines.

y.   In December 2021, the conspirators caused to be sold in the United States another truck with a non-conforming engine.

z.   In November 2022, the conspirators caused to be sold in the United States another truck with a non-conforming engine.

All in violation of 18 U.S.C. § 371.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)—Criminal Forfeiture)

1.     The allegations contained in Count 1 of this Information are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture against Hino Motors Ltd. pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

2.     Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) together with Title 28, United States Code, Section 2461(c), upon being convicted of the crime charged in Count 1 of this Information, the convicted defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offense.

3.     <u>Money Judgment</u>: Property subject to forfeiture includes, but is not

limited to, a forfeiture money judgment equal to $1,087,000,000 in United States currency.

4.     Substitute Property: The United States of America shall seek forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).


DAWN N. ISON
United States Attorney
Eastern District of Michigan

TODD KIM
Assistant Attorney General
Environment & Natural Resources
Division


*s/Mark L. Chasteen*

_____
MARK L. CHASTEEN
Chief, White Collar Crime Unit
Assistant United States Attorney

*s/Banumathi Rangarajan*

_____
BANUMATHI RANGARAJAN
Senior Trial Attorney
Environmental Crimes Section


*s/Andrew J. Yahkind*

_____
ANDREW J. YAHKIND
Assistant United States Attorney
Eastern District of Michigan


Dated: January 15, 2025

| United States District Court<br>Eastern District of Michigan | Criminal Case Cover Sheet | Case Number |
|---|---|---|

**NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.**

| Companion Case Information | Companion Case Number: |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)¹**: | Judge Assigned: |
| ☐ **Yes**   ☒ **No** | AUSA's Initials:  AJY |

**Case Title:** USA v.  Hino Motors, Ltd.

**County where offense occurred :** Washtenaw and elsewhere

**Check One:**   ☒ **Felony**      ☐ **Misdemeanor**      ☐ **Petty**

_____Indictment/__✓__Information --- **no** prior complaint.
_____Indictment/_____Information --- based upon prior complaint [**Case number:**                    ]
_____Indictment/_____Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information

**Superseding to Case No:** _____      **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

| January 15, 2025 | s/Andrew J. Yahkind |
|---|---|
| Date | Andrew J. Yahkind<br>Assistant United States Attorney<br>211 W. Fort Street, Suite 2001<br>Detroit, MI  48226-3277<br>Phone:(313) 226- 9565<br>Fax:<br>E-Mail address: andrew.yahkind@usdoj.gov<br>Attorney Bar #: |

¹ Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.